FILED

APR 29 2026

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

RECEIVED

APR 29 2026

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

JAMIE OSUNA BD0868
PO Box 8800 CSP-COR
Corcoran, CA 93212,
Plaintiff,

v.

A. GUERRERO; C. LOVE; J. ZAMORA; A. JOHNSON; T. BRAZELTON; DOES 1-10; THE CURRENT WARDEN OF CALIFORNIA STATE PRISON-CORCORAN; THE CURRENT CDCR/CSP-CORCORAN OFFICIAL RESPONSIBLE FOR C-FILE/SOMS SECURITY, ACCESS CONTROLS, AND ACCESS LOGS,
Defendants.

No. 1:24-cv-01009-KES-SAB (PC)
SECOND AMENDED COMPLAINT

42 U.S.C. § 1983

1. **First Amendment Retaliation**

2. **Eighth Amendment Deliberate Indifference**

3. **Fourteenth Amendment Informational Privacy**

4. **Prospective Injunctive Relief**

**JURY TRIAL DEMANDED**

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), because this is a civil action arising under 42 U.S.C. § 1983.

2. Plaintiff seeks injunctive relief, compensatory damages, and punitive damages pursuant to 42 U.S.C. § 1983.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred at California State Prison-Corcoran in Corcoran, California, which is within the Eastern District of California.

## II. INTRODUCTION

4. In March 2019, the events underlying Kings County case no. 19CM-1882 occurred inside California State Prison-Corcoran.

5. Plaintiff alleges that, because the incident occurred inside CSP-Corcoran, Corcoran investigative personnel, including ISU staff, were responsible for the collection, storage, safekeeping, access control, and related handling of the photographs and other materials created during the investigation and maintained pending trial.

6. Because of the sensitivity of case no. 19CM-1882, Plaintiff's C-File/SOMS was placed on heightened security restrictions so that access would be tracked and limited. Plaintiff later

1

learned that those heightened restrictions had been removed without notice to Plaintiff.

7. The 19CM-1882 photographs and related materials were treated as confidential in Plaintiff's criminal case. Plaintiff himself was not allowed to possess the photographs because, in Plaintiff's criminal proceedings, the prosecution took the position that possession of those photographs created institutional-security concerns.

8. Despite those protections, Plaintiff later learned that confidential 19CM-1882 materials had been leaked, posted publicly online, traded, described, and monetized, including in public internet content and content associated with a former CDCR employee.

9. One of the publicly circulated images showed Plaintiff's full face in a prison mental-health setting during a strip search, thereby exposing Plaintiff in a vulnerable patient setting.

10. Plaintiff repeatedly complained through prison channels and directly to staff that confidential materials had been leaked, publicly circulated, and used by persons claiming to be CDCR staff or claiming access to Plaintiff's file. Plaintiff repeatedly asked that the leak be documented and that heightened security be restored to Plaintiff's C-File/SOMS.

11. Plaintiff later learned through public federal-court filings in *Solares v. Burns*, E.D. Cal. No. 1:21-cv-01349-LHR-BAM, an Answer to the Third Amended Complaint, Doc. 73, filed October 1, 2025, that Erik Beam, a CDCR lieutenant who worked at Salinas Valley State Prison rather than Corcoran in March 2019, admitted that he shared a limited number of 19CM-1882 photographs with other prison officials. Plaintiff learned of that sharing through the public docket rather than from CDCR notice.

12. Plaintiff seeks damages for completed constitutional violations and prospective relief aimed at restoring heightened security to Plaintiff's file, preserving and auditing access records, obtaining an accounting of access and related investigations, reducing further unauthorized dissemination, and requiring notice of confirmed future breaches.

### III. PARTIES

13. Plaintiff Jamie Osuna is, and at all relevant times was, a CDCR prisoner. Plaintiff is currently housed at CSP-Corcoran.

14. Defendant A. GUERRERO was, at all relevant times, an ISU officer at CSP-Corcoran and is

2

sued in their individual capacity for damages.

15. Defendant C. LOVE was, at all relevant times, an ISU lieutenant at CSP-Corcoran and is sued in their individual capacity for damages.

16. Defendant J. ZAMORA was, at all relevant times, a correctional counselor at CSP-Corcoran and is sued in their individual capacity for damages.

17. Defendant A. JOHNSON was, at all relevant times, a captain at CSP-Corcoran and is sued in their individual capacity for damages.

18. Defendant T. BRAZELTON was, at all relevant times, an ISU officer at CSP-Corcoran and is sued in their individual capacity for damages.

19. Plaintiff does not presently know the true names of Does 1-10. Plaintiff alleges that those Doe defendants were CDCR employees or agents who accessed, copied, transmitted, posted, traded, sold, or otherwise disclosed Plaintiff's personal or confidential materials without authorization. Plaintiff will seek leave to amend when their identities are discovered.

20. The Current Warden of CSP-Corcoran is sued in official capacity only for prospective injunctive relief.

21. The current CDCR or CSP-Corcoran official responsible for C-File/SOMS security, access controls, access logging, or audit records concerning Plaintiff's file is sued in official capacity only for prospective injunctive relief.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

22. Plaintiff timely exhausted grievance log 317283 through all available CDCR levels.

### V. FACTUAL ALLEGATIONS

23. In or around May 2019, while Plaintiff was at California Health Care Facility, a special committee recognized Plaintiff's case no. 19CM-1882 as sensitive and placed heightened security restrictions on Plaintiff's C-File/SOMS.

24. After that protection was put in place, staff were required to record the reason for access, the authority for access, and identifying information when entering Plaintiff's file.

25. Plaintiff's C-File/SOMS and related systems contained confidential materials concerning 19CM-1882 together with Plaintiff's personal information.

3

26. On May 2, 2019, a Kings County judge denied a media request for the confidential case report in 19CM-1882.

27. On or about May 24, 2019, county counsel stated that preserving the integrity of the evidence and Plaintiff's due-process rights supported keeping the record sealed or confidential.

28. The 19CM-1882 photographs were treated as confidential in Plaintiff's criminal case.

29. Plaintiff himself was not allowed to possess the 19CM-1882 photographs because of stated institutional-security concerns.

30. In April 2019, CDCR sent Plaintiff written notice concerning unauthorized disclosure of Plaintiff's personal information online, including Plaintiff's name and cell-location information, and Plaintiff was informed that steps had been taken to remove that information.

31. In May 2019, CDCR sent Plaintiff written notice concerning unauthorized disclosure of Plaintiff's dental records online, and Plaintiff was informed that steps had been taken to remove that information.

32. Those prior notices informed Plaintiff that CDCR had previously provided written notice of unauthorized disclosures involving Plaintiff's personal or medical-related information and had previously taken steps to seek removal of such information from public online sources.

33. In or around October 2022, Plaintiff learned from various sources, including inmates, that 19CM-1882 crime-scene photographs were circulating online and/or being shown to those inmates on officers' cellphones.

34. Plaintiff filed a grievance about that leak.

35. In or around December 2022, that grievance was transferred to CSP-Corcoran for review.

36. On or about March 23, 2023, Defendant ZAMORA told Plaintiff that the heightened security lock was no longer on Plaintiff's C-File/SOMS.

37. Plaintiff objected and reminded ZAMORA that a special committee had previously placed that protection on his file because of case no. 19CM-1882.

38. Plaintiff was not notified when or why the heightened security had been removed from Plaintiff's file.

39. During 2023 committee proceedings, including a committee on or about May 18, 2023, Plaintiff

4

asked that heightened security be restored to Plaintiff's file to stop further access and dissemination.

40. Plaintiff told committee staff, including Defendants ZAMORA and JOHNSON, that confidential 19CM-1882 materials were online, that staff were publicly talking about going into Plaintiff's file, and that Plaintiff's file needed to be re-secured.

41. Plaintiff also attempted to show ZAMORA and JOHNSON proof of the leak, including redacted materials, screenshots, descriptions, or links, inmate declarations/statements reflecting the public circulation of the 19CM-1882 materials.

42. Plaintiff also told committee staff that the leak was causing severe emotional distress and worsening Plaintiff's mental-health symptoms.

43. JOHNSON responded, "You're not known in the public—only in here."

44. ZAMORA agreed.

45. ZAMORA told Plaintiff she did not think Plaintiff met the type of case that should have that level of file security.

46. Plaintiff alleges that ZAMORA and JOHNSON were among the committee participants who could raise, approve, or refer requests concerning heightened file security, including requests to restore heightened tracking or access limits to Plaintiff's C-File/SOMS.

47. When Plaintiff again asked that the file be re-secured, ZAMORA and JOHNSON told Plaintiff to "602 it," meaning for Plaintiff to file a grievance.

48. ZAMORA also said they needed a court order before they would act.

49. Plaintiff repeatedly asked ISU staff to place a notation in Plaintiff's file reflecting the leak, the continuing breach risk, and the need for renewed security measures.

50. ISU staff refused to place that notation in Plaintiff's file.

51. In or around May or June 2023, Plaintiff was taken to a confidential setting by Defendants GUERRERO, BRAZELTON and ISU officer E. Sanchez for an interview on another complaint.

52. Plaintiff brought redacted leak materials and the grievance packet and tried to present those materials to ISU staff for reporting, documentation, and investigation.

53. Plaintiff told GUERRERO, in substance, that Plaintiff had filed a 602 attaching copies of those materials and that ISU crime-scene staff had failed to secure the photographs and had ignored the problem after Plaintiff reported it.

54. GUERRERO said he needed to turn off his body camera because of the nature of the discussion, and the cameras were turned off.

55. GUERRERO responded, "What will it matter—they're everywhere."

56. BRAZELTON had previously told Plaintiff he had been on the same social media account/site where the leaked photographs were being traded/offered.

57. Neither GUERRERO nor BRAZELTON accepted the evidence or took action to secure Plaintiff's file, document the leak, identify access to the file, or stop dissemination.

58. In or around June 2023, Plaintiff learned that additional 19CM-1882 photographs had been publicly posted online and that earlier leaks remained online.

59. One of the newly circulated images showed Plaintiff's full face in a prison mental-health setting during a strip search.

60. Plaintiff alleges that the image showing Plaintiff's full face in a prison mental-health or medical setting during a strip search was not merely a crime-scene photograph. The image was also taken in connection with Plaintiff's placement in a medical or mental-health facility, inspection of Plaintiff's body and injuries, and/or documentation of Plaintiff's medical or mental-health condition after the 19CM-1882 incident.

61. The public dissemination of that image therefore disclosed more than the existence of investigative materials. It disclosed Plaintiff's presence in a medical or mental-health setting, Plaintiff's vulnerable patient status, Plaintiff's body during a strip search or injury inspection, and medical/injury-related information that was not intended for public release.

62. Plaintiff alleges that this image had been taken by ISU or IGI staff during the 19CM-1882 investigation.

63. LOVE denied Plaintiff access to the redacted materials and/or refused to accept them after Plaintiff attempted to present them as proof of the leak.

64. Plaintiff alleges that LOVE, as an ISU lieutenant, was within the unit and chain of command

6

responsible for the creation of, safekeeping, access control, and related handling of the 19CM-1882 photographs and other investigative materials.

65. Plaintiff also alleges that LOVE told Plaintiff that, during the early 2019 investigation, LOVE had taken home a USB/disc containing 19CM-1882 crime-scene materials for safekeeping.

66. Around late June or July 2023, Defendant GUERRERO, accompanied by J. Fugate, came to Plaintiff's cell concerning Plaintiff's complaint about the leak and Plaintiff's redacted proof of the same.

67. Plaintiff told GUERRERO that the packet concerned 19CM-1882 photographs that had been unlawfully disseminated, that Plaintiff had filed grievances about the leak, and that the offered materials contained redacted public posts, descriptions, links, and other information reflecting claimed file or photo access by CDCR personnel.

68. GUERRERO told Plaintiff there was nothing he could do because the matter was "civil."

69. GUERRERO told Plaintiff to "602 it" and "appeal it."

70. GUERRERO also separately told Plaintiff that Plaintiff could not grieve the leak because 19CM-1882 was an ongoing case.

71. GUERRERO refused to take the evidence or packet Plaintiff offered.

72. During the same sequence of discussions about Plaintiff's grievance packet and the leak, Plaintiff also alleges that GUERRERO referenced not wanting to lose his/their [ISU] jobs over the matter.

73. During court transportation in 2023, Plaintiff again asked GUERRERO about the status of Plaintiff's leak grievances and whether ISU or CSP-Corcoran was taking action to address the leak.

74. GUERRERO responded that the leak "doesn't matter," that the photographs were "already out there," and "why even bother" addressing it.

75. GUERRERO also stated that unless something was marked in Plaintiff's file, he would not look into the leak or acknowledge it.

76. At that time, Plaintiff had already repeatedly asked ISU staff to place such a notation in the file, and ISU staff had refused to do so.

7

77. During court-transportation in 2023, while Plaintiff was in the court holding area, Plaintiff spoke with ISU officers who were transporting him for court and who Plaintiff understood to have responsibilities connected to the 19CM-1882 investigation and safekeeping of 19CM-1882 materials, including Defendant GUERRERO.

78. Plaintiff told GUERRERO and the other ISU officers, in substance, that Plaintiff had redacted public posts, screenshots, links, or descriptions showing that 19CM-1882 photographs and related materials were publicly circulating. Plaintiff asked whether they wanted to review those materials because ISU staff and other prison staff kept denying that photographs were publicly available, illegally accessed, or disseminated.

79. Plaintiff told GUERRERO and the other ISU officers, in substance, that because ISU personnel were investigators or custodians of the 19CM-1882 materials, they were responsible for ensuring the safekeeping, documentation, and preservation of those materials.

80. GUERRERO and/or the ISU officers refused to accept or review the materials Plaintiff offered. GUERRERO told Plaintiff, in substance, that Plaintiff should file a civil complaint. Plaintiff responded that ISU would eventually have to do something because the materials were being posted, commented on, and used with derogatory statements about Plaintiff.

81. When GUERRERO stated, in substance, that the photographs or materials were already "already out there," and questioned why ISU should do anything if the materials were already everywhere, Plaintiff responded that public posts and comments were still being made and that continued dissemination, staff comments, and public circulation risked interfering with Plaintiff's right to a fair and impartial jury in his pending criminal case.

82. Plaintiff asked whether ISU was looking into the leak. GUERRERO responded, in substance, "Why would we do that," and argued back and forth with Plaintiff.

83. During the same exchange, the other ISU officer told Plaintiff, in substance, that Plaintiff kept filing 602s and asked what Plaintiff expected, or asked why Plaintiff did not stop filing 602s. The officer also stated, in substance, that because Plaintiff was filing 602s, things were just going to keep getting worse.

84. Plaintiff told GUERRERO that ISU was responsible and legally obligated to document, protect,

8

and address the leak. GUERRERO responded, in substance, "We got our ways and you got yours," or "We have our ways and strategies too."

85. Plaintiff understood those statements, together with GUERRERO's refusal to accept the leak proof and GUERRERO's statements about ISU having its own "ways" or "strategies," as a warning that Plaintiff's continued grievances, complaints, and efforts to expose the leak would result in continued non-protection, continued refusal to investigate, or worsening consequences.

86. These statements also reinforced Plaintiff's fear that staff were using the public circulation of the 19CM-1882 materials and refusal to secure Plaintiff's file as leverage to discourage Plaintiff from filing grievances, reporting staff misconduct, and fighting his criminal case.

87. Plaintiff's understanding of the ISU officers' statements as threatening was informed by prior staff statements discouraging Plaintiff from fighting his criminal case and by the later statements tying Plaintiff's 602 activity to things "getting worse."

88. Plaintiff learned that 19CM-1882 materials were being reposted, described, traded, and sold on public websites and social-media platforms.

89. Some public posts stated or implied that the materials came from CDCR staff or from Plaintiff's file.

90. Plaintiff learned of public posts by persons identifying themselves as CDCR employees stating that they had gone into Plaintiff's file and viewed or obtained the photographs.

91. One such public post, attributed to CDCR employee Maria Garcia, stated: "Good one, Hector! I read this crazy fkrs [sic] file and got the crime scene photos of his dead cellmate."

92. Plaintiff further learned that former lieutenant Hector Ferrel publicly stated he had read Plaintiff's file "numerous times," publicly discussed and gave interviews about 19CM-1882, and later used 19CM-1882 photographs in internet content and paid memberships.

93. Plaintiff also learned from inmates that at least one 19CM-1882 photograph had been shown to inmates from a correctional officer's personal cellphone. Based on those inmate reports and the public statements described above, Plaintiff alleges that the public dissemination of 19CM-1882 materials occurred through staff access to Plaintiff's file, staff-held copies, personal-device copying or display, or some combination of those sources.

9

94. Plaintiff also learned of a public podcast production in which the reporter stated that she had "finally managed" to obtain 19CM-1882 crime-scene photographs she "was not supposed to have" and had shared them with others involved in the production. Plaintiff further learned that the reporter maintained personal or social-media connections with CDCR staff, including a Corcoran mental-health supervisor, a Corcoran ISU officer, and a CDCR program manager. Plaintiff alleges those facts support discovery into how the reporter obtained the photographs and whether any CDCR employee or agent provided, confirmed, described, or facilitated access to them.

95. Plaintiff was shocked by the public spread of these materials because the photographs were treated as confidential in the criminal case and Plaintiff himself was not allowed to possess them.

96. Plaintiff also told prison and health staff that the leak was causing severe emotional distress, worsening mental-health symptoms, self-injurious behavior, and repeated Crisis Unit commitments.

97. Even after those reports and the 2025 criminal-court statement, the heightened security on Plaintiff's file was not restored, no notation was placed in Plaintiff's file regarding the leak, and Plaintiff was not provided a full accounting of access to the file.

98. Plaintiff did not receive written breach notice, audit findings, investigation results, claw-back notice, takedown notice, staff discipline notice, mitigation notice, or other written remedial information after that statement

99. Plaintiff later learned through public filings in *Solares v. Burns*, E.D. Cal. No. 1:21-cv-01349-LHR-BAM, that a pleading in that case alleged Erik Beam, a CDCR lieutenant who worked at Salinas Valley State Prison rather than Corcoran, had sent the photographs through private and work emails, including to non-investigative staff, with statements including "Work can always get worse."

100. Plaintiff further learned from Defendant Beam's answer in *Solares v. Burns*, E.D. Cal. No. 1:21-cv-01349-LHR-BAM, Doc. 73, filed October 1, 2025, that Beam admitted that he had shared a "limited number of photographs" with other prison officials and asserted that he had

10

done so for legitimate penological purposes.

101. Plaintiff learned of Beam's sharing through the public docket, not from CDCR, not from ISU, and not through any written breach notice to Plaintiff.

102. Plaintiff still has not been told who accessed Plaintiff's file, when they accessed it, what they viewed, what they copied, what they sent, whether investigations were opened, or what the outcomes of those investigations were.

103. The public circulation of Plaintiff's materials exposed Plaintiff to humiliation, fear for safety, exposure as a mental-health patient in a vulnerable setting, severe emotional distress, worsening mental-health symptoms, self-injury, scarring, and repeated crisis placements.

104. Plaintiff's claims are based on this leak-centered course of conduct and the resulting refusals to document, secure, audit, or address the leak after repeated notice.

105. Plaintiff does not seek relief in this action based solely on any denial of a grievance or appeal.

## VI. CLAIM ONE: First Amendment Retaliation

### Against Defendant A. GUERRERO

106. Plaintiff engaged in protected First Amendment activity by filing grievances and complaints concerning the leak of 19CM-1882 materials, attempting to submit redacted proof of the leak through prison channels, and repeatedly complaining to staff that CDCR employees had accessed Plaintiff's file and disseminated confidential materials from it.

107. At all relevant times, Defendant GUERRERO was a CDCR ISU officer acting under color of state law.

108. GUERRERO knew of Plaintiff's protected conduct. Plaintiff told GUERRERO that Plaintiff had filed a grievance ("602") concerning the leak, had attached copies or descriptions of the leaked materials, and was trying to submit redacted proof through prison channels.

109. After Plaintiff engaged in that protected conduct, GUERRERO took adverse action against Plaintiff by refusing to accept Plaintiff's grievance-related evidence, refusing to document or investigate the leak, giving shifting reasons why ISU would not address the leak, and participating in or failing to correct statements tying Plaintiff's continued grievance activity to things "getting worse."

11

110. In or around May or June 2023, Plaintiff showed GUERRERO the grievance packet and leak documents and told him, in substance, that Plaintiff had filed a grievance attaching copies of those materials. GUERRERO refused to take the evidence and responded, "What will it matter—they're everywhere."

111. Around late June or July 2023, GUERRERO came to Plaintiff's cell concerning Plaintiff's complaint about the leak and Plaintiff's redacted proof. Plaintiff told GUERRERO that the offered packet was proof that photographs and related materials from 19CM-1882 had been unlawfully disseminated. GUERRERO responded that there was nothing he could do because the matter was "civil," told Plaintiff to "602 it" and "appeal it," then told Plaintiff that Plaintiff could not grieve the leak because 19CM-1882 was an ongoing criminal case. GUERRERO refused to take the packet or evidence Plaintiff offered.

112. During court transportation in 2023, Plaintiff again asked GUERRERO about the status of Plaintiff's leak grievances and whether ISU or CSP-Corcoran was taking action to address the leak. GUERRERO responded that the leak "doesn't matter," that the photographs were "already out there," and "why even bother" addressing it. GUERRERO further stated that unless the leak was marked in Plaintiff's file, he would not look into it or acknowledge it, even though Plaintiff had already repeatedly asked ISU staff to place such a notation in the file and ISU staff had refused to do so.

113. During the court-transportation exchange described above, GUERRERO and another ISU officer directly connected Plaintiff's grievance activity to the worsening situation. In GUERRERO's presence, Plaintiff was asked why he did not stop filing 602s or was told, in substance, that because Plaintiff kept filing 602s, things would keep getting worse. GUERRERO also told Plaintiff, in substance, that ISU had its own "ways" or "strategies," refused Plaintiff's offered proof, and questioned why ISU would investigate when the materials were already "out there."

114. GUERRERO's conduct was more than de minimis. It blocked or obstructed Plaintiff's attempts to submit proof, document the leak, obtain renewed file security, and report staff misconduct concerning unauthorized access to and dissemination of confidential 19CM-1882

12

materials.

115. GUERRERO's conduct would chill a prisoner of ordinary firmness from continuing to file grievances, complaints, and litigation-related requests about staff misconduct, unauthorized disclosure of confidential materials, and interference with Plaintiff's criminal-case protections, even though Plaintiff continued to pursue grievances and complaints despite GUERRERO's conduct.

116. Plaintiff's protected conduct was a substantial or motivating factor in GUERRERO's conduct. Retaliatory motive is shown by GUERRERO's knowledge of Plaintiff's grievances, the direct reference to Plaintiff's continued grievances, the timing of GUERRERO's statements after Plaintiff filed and pursued leak grievances, GUERRERO's refusal to accept the offered evidence, GUERRERO's statement that ISU had its own "ways" or "strategies," after Plaintiff had already been threatened to not fight his criminal case, GUERRERO's reference to not wanting to lose his job or ISU jobs over the matter, and GUERRERO's shifting explanations for refusing to act.

117. GUERRERO's conduct did not reasonably advance a legitimate correctional goal. Plaintiff was offering redacted proof of an ongoing unauthorized dissemination of confidential 19CM-1882 materials to ISU officers who had the ability to document the leak, refer the matter, preserve evidence, request an audit, restore heightened security, or take other reasonable protective steps.

118. As a direct and proximate result of GUERRERO's retaliatory conduct, Plaintiff was intimidated, obstructed, and burdened in his efforts to report staff misconduct, protect confidential materials, seek file-security restoration, and reduce ongoing dissemination. Plaintiff also suffered continuing fear, humiliation, emotional distress, worsening mental-health symptoms, self-injury, scarring, and repeated crisis placements.

## VII. CLAIM TWO: Eighth Amendment Deliberate Indifference to a Substantial Risk of Serious Harm

### Against Defendants C. LOVE, A. GUERRERO, J. ZAMORA, A. JOHNSON, and T. BRAZELTON

119. At all relevant times, Defendants LOVE, GUERRERO, ZAMORA, JOHNSON, and BRAZELTON were CDCR employees acting under color of state law.

120. Plaintiff was incarcerated under conditions posing a substantial risk of serious harm to Plaintiff's safety and health. Confidential materials connected to Plaintiff's file and case no. 19CM-1882 were publicly disseminated, reposted, traded, and sold, exposing Plaintiff to public humiliation, staff and inmate attention, threats to institutional safety, and worsening mental-health symptoms. One disseminated image showed Plaintiff's full face in a prison mental-health setting during a strip search, thereby exposing Plaintiff in a vulnerable medical or mental-health setting.

121. Plaintiff also had serious mental-health needs. Plaintiff told staff that the leak was causing severe emotional distress, worsening Plaintiff's mental-health symptoms, triggering self-injurious behavior, and leading to repeated Crisis Unit commitments.

122. This claim is not based merely on the denial of grievances or the failure to grant appeals. This claim is based on each defendant's personal notice of an ongoing leak and each defendant's refusal to take reasonable available steps to reduce or stop the resulting risk.

123. Defendant LOVE had actual knowledge of the risk when Plaintiff's redacted leak evidence and dispute over the public dissemination of 19CM-1882 materials were elevated to LOVE as an ISU lieutenant, and LOVE refused to accept or allow Plaintiff to present those materials.

124. LOVE's actual knowledge was further shown by LOVE's statement that, during the early 2019 investigation, LOVE had taken home a USB/disc containing 19CM-1882 crime-scene materials for safekeeping. That statement showed LOVE's personal knowledge that the materials were sensitive, were handled by ISU, and required controlled safekeeping.

125. LOVE, as an ISU lieutenant, was within the unit and chain of command responsible for the safekeeping, access control, and related handling of the 19CM-1882 photographs and other investigative materials.

126. Defendant GUERRERO had actual knowledge of the risk when Plaintiff told GUERRERO that confidential 19CM-1882 materials had been unlawfully disseminated, tried to give GUERRERO printed proof of the leak during a confidential interview, and again raised the

14

issue during court transportation and in the court holding area.

127. During the confidential interview, Plaintiff told GUERRERO that ISU crime-scene staff had failed to secure the photographs and had ignored the problem after Plaintiff reported it. GUERRERO responded, "What will it matter—they're everywhere."

128. During court transportation and court holding area, Plaintiff asked GUERRERO whether ISU or CSP-Corcoran was taking action to address the leak. GUERRERO responded that the leak "doesn't matter," that the photographs were "already out there," and "why even bother" addressing it.

129. GUERRERO's actual knowledge was further shown during such exchange, when Plaintiff offered copies of posts, screenshots, links, or descriptions showing public dissemination of the 19CM-1882 materials; told GUERRERO that ISU staff were responsible for safekeeping and preservation of those materials; told GUERRERO that public posts and derogatory comments were continuing; and explained that the leak was creating safety, mental-health, and fair-trial concerns.

130. Rather than accept the proof, document the leak, refer the matter for investigation, request an access audit, seek restoration of heightened file security, or take other reasonable steps to reduce the risk, GUERRERO refused the materials, questioned why ISU would investigate, stated in substance that the materials were already everywhere.

131. GUERRERO, after Plaintiff had already been threatened to not fight his criminal case, also heard or participated in statements tying Plaintiff's continued grievances to the situation "getting worse," and suggested that ISU had its own "ways" or "strategies."

132. Plaintiff alleges those statements showed that GUERRERO was not merely negligent or unaware, but actually understood the risk and consciously disregarded it after Plaintiff repeatedly reported the leak and its consequences..

133. Defendant BRAZELTON had actual knowledge of the risk when Plaintiff offered proof of public dissemination, explained that ISU had responsibility for safekeeping the 19CM-1882 materials, raised the continuing public posts, derogatory comments, and resulting harm, and BRAZELTON stated that he had been on the same sites or accounts where the leaked

photographs were being traded.

134. BRAZELTON nevertheless refused or failed to accept Plaintiff's evidence, document the leak, refer the matter for investigation, request an access audit, seek restoration of heightened file security, or take other reasonable steps to reduce the risk.

135. Defendant ZAMORA had actual knowledge of the risk when Plaintiff told ZAMORA that confidential 19CM-1882 materials were online, that staff were publicly talking about going into Plaintiff's file, that the file needed to be re-secured, and that the leak was causing serious emotional and mental-health harm.

136. Defendant JOHNSON had actual knowledge of the risk when Plaintiff raised the same facts around the May 18, 2023, committee, attempted to show proof of the leak, and requested that heightened security be restored to stop further access and dissemination.

137. ZAMORA and JOHNSON were among the committee participants who could raise, approve, or refer requests concerning heightened file security, including requests to restore heightened tracking or access limits to Plaintiff's C-File/SOMS.

138. Despite their knowledge, ZAMORA and JOHNSON failed to take reasonable measures to reduce the risk. They did not restore or refer for restoration of the heightened security previously placed on Plaintiff's C-File/SOMS. ZAMORA told Plaintiff that a court order was needed before staff would act, and JOHNSON dismissed Plaintiff's concerns by stating, "You're not known in the public—only in here."

139. From Plaintiff's repeated reports, offered proof, descriptions of public posts, requests for file security, and reports of worsening self-harm-related symptoms, each defendant actually understood that Plaintiff faced an excessive risk of serious harm to safety and health from the ongoing leak, continued public circulation of the materials, exposure of Plaintiff in a mental-health setting, and worsening mental-health symptoms.

140. Despite that knowledge, LOVE failed to take reasonable measures to reduce the risk. LOVE did not initiate protective action based on the notice provided, did not take reasonable steps to secure the materials, and did not take reasonable steps to identify who had accessed, copied, or disseminated them, despite LOVE's ISU position, LOVE's prior personal handling of

19CM-1882 materials, and Plaintiff's notice that the materials were publicly accessible online.

141. Despite that knowledge, GUERRERO failed to take reasonable measures to reduce the risk. GUERRERO refused to take Plaintiff's evidence, told Plaintiff that Plaintiff could not grieve the leak because the criminal case was ongoing, told Plaintiff the matter was "civil," and later refused to look into the leak unless it was marked in Plaintiff's file.

142. By the time GUERRERO made that statement, Plaintiff had already repeatedly asked ISU staff to place a notation in the file regarding the leak and the need for renewed security, and ISU staff had refused to place that notation in the file.

143. Despite that knowledge, BRAZELTON failed to take reasonable measures to reduce the risk. Although BRAZELTON acknowledged that he had been on the same sites/accounts where the photographs were being traded, BRAZELTON did not accept Plaintiff's evidence, did not report the leak, and did not take reasonable steps to address the continuing dissemination.

144. After receiving notice of the leak and its consequences, none of these defendants restored or referred for restoration of heightened security, placed a notation in Plaintiff's file, took reasonable steps to identify who accessed or copied the materials, or took reasonable steps to stop or reduce further dissemination.

145. These failures were more than negligence. Each defendant knew facts showing an excessive risk to Plaintiff's safety and health, actually understood that risk, and consciously failed to take reasonable available measures to abate it.

146. As a direct and proximate result of defendants' acts and omissions, Plaintiff's file remained unsecured, the leak remained unaddressed, and Plaintiff continued to face exposure, humiliation, fear for safety, worsening mental-health symptoms, self-injury, scarring, and repeated Crisis Unit commitments.

147. By knowingly disregarding a substantial risk of serious harm to Plaintiff's safety and health, Defendants LOVE, GUERRERO, ZAMORA, JOHNSON, and BRAZELTON violated Plaintiff's rights under the Eighth Amendment.

## VIII. CLAIM THREE: Fourteenth Amendment Informational Privacy

17

Against DOES 1-10

148. At all relevant times, DOES 1-10 were CDCR employees or agents acting under color of state law. Plaintiff alleges these Doe defendants had access to Plaintiff's file, related systems, photographs, or related confidential materials only by virtue of their state employment or agency relationship.

149. Plaintiff had a protected privacy interest under the Fourteenth Amendment in avoiding public disclosure of highly personal information, including medical, mental-health, strip-search, injury-inspection, body-privacy, and vulnerable-patient-setting information.

150. This claim is not based merely on the fact that 19CM-1882 crime-scene photographs were leaked. This claim is based on the public disclosure of Plaintiff's own full-face image and related information showing Plaintiff in a prison medical or mental-health setting during a strip search, injury inspection, medical observation, mental-health observation, or related institutional documentation after the 19CM-1882 incident.

151. The image disclosed more than Plaintiff's identity or involvement in 19CM-1882. It disclosed Plaintiff's presence in a medical or mental-health setting, Plaintiff's full face/identity during a strip search or inspection, Plaintiff's vulnerable patient status, and medical, mental-health, or injury-related information not intended for public release.

152. Plaintiff did not consent to public disclosure of that image or related information.

153. Plaintiff alleges that DOES 1-10 intentionally, knowingly, or with reckless disregard for Plaintiff's privacy, safety, and mental health, accessed, copied, transmitted, posted, traded, sold, monetized, or otherwise disclosed the image to persons or arenas outside any legitimate treatment, security, investigative, court-controlled, or other authorized institutional purpose.

154. Although the image may have been created, possessed, or retained for investigative, security, medical, evidentiary, or documentation purposes, Plaintiff alleges that those purposes did not authorize public disclosure, internet publication, social-media dissemination, podcast use, sale, trade, monetization, or disclosure to persons with no legitimate need to know.

155. Plaintiff alleges that the public disclosure was arbitrary, conscience-shocking, and unrelated to any legitimate correctional purpose because it exposed Plaintiff's medical or mental-health

18

setting, body privacy, strip-search or injury-inspection context, and vulnerable patient status to inmates, former inmates, CDCR staff, internet users, and members of the public.

156. Plaintiff's privacy interest in avoiding public disclosure of that image and related information outweighed any legitimate governmental interest in public dissemination because any legitimate need for the image was limited to internal treatment, safety, investigation, evidence preservation, litigation, or court-controlled use.

157. Plaintiff alleges that DOES 1-10 either directly disclosed the image or knowingly enabled the disclosure by accessing, copying, transmitting, removing, retaining, or allowing the image to leave authorized CDCR, law-enforcement, medical, investigative, or court-controlled channels without authorization.

158. Plaintiff alleges that the image and related 19CM-1882 materials were later reposted, described, traded, sold, monetized, or used in podcasts, social-media posts, websites, and other public internet content.

159. Plaintiff further alleges that current or former CDCR employees publicly posted about accessing Plaintiff's file and obtaining photographs from it, supporting the inference that the disclosure originated from state access to Plaintiff's file, state-held copies, staff-held copies, personal-device copying or display, or some combination of those sources.

160. The disclosure caused Plaintiff actual injury, including humiliation, fear for safety, exposure as a mental-health or medical patient in a vulnerable setting, severe emotional distress, worsening mental-health symptoms, self-injurious behavior, scarring, and repeated Crisis Unit commitments.

161. The disclosure also created a substantial risk of continuing harm because the image exposed Plaintiff's identity, body privacy, and presence in a medical or mental-health setting to inmates, former inmates, CDCR staff, and the public, and because internet dissemination allowed the image to be saved, reposted, traded, sold, and monetized.

162. The acts of DOES 1-10 were more than negligence. Plaintiff alleges that DOES 1-10 acted intentionally, knowingly, or with reckless indifference to Plaintiff's constitutional privacy rights, safety, and mental health.

19

163. As a direct and proximate result of the acts and omissions of DOES 1-10, Plaintiff suffered actual injury and deprivation of Plaintiff's Fourteenth Amendment right to informational privacy and substantive due process.

164. Plaintiff does not presently know the true names of DOES 1-10. Plaintiff will seek leave to amend to substitute their names when discovered through audit logs, investigative files, access histories, access records, chain-of-custody materials, internal communications, or discovery

## IX. CLAIM FOUR: Prospective Injunctive Relief

### Against the Current Warden of CSP-Corcoran and the Current CDCR/CSP-Corcoran Official Responsible for C-File/SOMS Security, Access Controls, and Access Logs

165. At all relevant times, the official-capacity defendants were, and are, state actors acting under color of state law.

166. Plaintiff seeks prospective relief to prevent ongoing and threatened future violations of Plaintiff's constitutional rights arising from the continued lack of heightened security on Plaintiff's C-File/SOMS, the continued failure to identify and address unauthorized access to Plaintiff's file and related materials, and the continuing risk that Plaintiff's confidential materials will be accessed, copied, transmitted, or disseminated without authorization.

167. Plaintiff exhausted available administrative remedies concerning the leak. To the extent prison staff prevented completion of any additional remedy, those remedies were rendered unavailable when staff refused to accept evidence, told Plaintiff that Plaintiff could not grieve the issue because the criminal case was ongoing, and refused to place any notation in Plaintiff's file reflecting the leak and continuing breach risk.

168. There is a real and immediate threat of repeated injury to Plaintiff. The heightened security that had previously been placed on Plaintiff's C-File/SOMS was removed and has not been restored; the leak has not been placed in Plaintiff's file; Plaintiff has not been provided a full access history, breach accounting, audit result, or investigation outcome; public posts and other content using or describing the leaked materials have remained online; and Plaintiff alleges unauthorized staff-held or staff-derived copies may still exist.

20

169. Plaintiff continues to face a real and immediate threat that, absent court-ordered relief, Plaintiff's file and related materials will remain unsecured and may continue to be accessed, copied, transmitted, retained, reposted, sold, monetized, or disseminated without authorization and without notice.

170. Plaintiff also faces a continuing threat of repeated harm from the ongoing public circulation of Plaintiff's mental-health/strip-search image and related confidential materials, including continuing humiliation, fear for safety, exposure in a vulnerable patient setting, and worsening mental-health symptoms.

171. Money damages alone cannot prevent future unauthorized access, future dissemination, or the continued absence of file security, access auditing, breach notation, and breach notice.

172. The official-capacity defendants have present authority to restore heightened security to Plaintiff's file, preserve and audit access logs, require internal notation of the breach risk, issue written notices concerning confirmed unauthorized access, and direct reasonable institutional steps to reduce further unauthorized dissemination.

173. Plaintiff therefore seeks narrowly tailored forward-looking injunctive relief requiring the official-capacity defendants to restore heightened security to Plaintiff's file, preserve and audit relevant records, provide an accounting of access and related investigations subject to lawful redactions, require notation of the breach risk, take reasonable steps to reduce further unauthorized dissemination, and provide notice of confirmed future breaches.

## X. PRAYER FOR RELIEF

Wherefore, Plaintiff requests that judgment be entered in Plaintiff's favor and against Defendants as follows:

1. Compensatory damages against the individual-capacity defendants, jointly and severally, in the fixed amount of $1,500,000.

2. Punitive damages against the individual-capacity defendants in the following amounts:

    a. against Defendant A. GUERRERO in the fixed amount of $350,000;

    b. against Defendant C. LOVE in the fixed amount of $350,000;

    c. against Defendant J. ZAMORA in the fixed amount of $250,000;

21

d. against Defendant A. JOHNSON in the fixed amount of $250,000;

e. against Defendant T. BRAZELTON in the fixed amount of $250,000; and

f. against each Doe defendant, when identified, in the fixed amount of $200,000.

3. Nominal damages of $1.00 against each defendant found liable.

4. Prospective injunctive relief against the official-capacity defendants requiring them to:

    a. restore heightened security restrictions to Plaintiff's C-File/SOMS and related records;

    b. preserve all existing access logs, audit trails, access histories, internal emails, chain-of-custody records, investigative records, and related records showing access to Plaintiff's file, SOMS, C-File, 19CM-1882 photographs, or related digital materials from March 2019 to the present;

    c. identify any categories of responsive access, audit, chain-of-custody, investigative, or preservation records that no longer exist, cannot be located, or were not preserved;

    d. conduct an audit of the preserved records to determine, to the extent reasonably ascertainable, who accessed, viewed, downloaded, copied, printed, transmitted, removed, retained, or disclosed Plaintiff's file materials, 19CM-1882 photographs, or related confidential materials;

    e. provide Plaintiff a written accounting, identifying, to the extent known, recorded, or reasonably ascertainable: each known access date; the accessing employee or user; badge number, employee number, or user identifier if available; the location, terminal, institution, or system of access if available; the reason entered for access; what materials were viewed, downloaded, copied, printed, exported, or transmitted if known; what leak-related investigations were opened; which agencies or units handled those investigations; and the status or outcome of those investigations;

    f. place a notation in Plaintiff's C-File/SOMS and related records that Plaintiff's file has been the subject of unauthorized-disclosure allegations and must be handled under heightened security procedures;

    g. provide written notice to Plaintiff of future confirmed unauthorized access, disclosure, transmission, copying, or dissemination involving Plaintiff's personal information,

medical or mental-health-related information, 19CM-1882 materials, or related confidential records;

h. use reasonable institutional efforts to prevent further unauthorized access, copying, transmission, retention, or dissemination of Plaintiff's confidential materials by CDCR staff, agents, or persons acting under CDCR authority;

i. use reasonable efforts to seek removal or takedown of specifically identified unauthorized public posts, photographs, videos, podcasts, websites, or monetized content containing Plaintiff's leaked materials or image, including by sending written requests to platforms, publishers, or possessors where feasible and preserving records of those requests and responses;

j. use reasonable efforts to identify and recover unauthorized staff-held or staff-derived copies of the materials at issue, or document efforts to identify and recover those copies;

k. provide written notice of confirmed unauthorized dissemination and confirmed audit findings to Plaintiff and, to the extent not prohibited by law or court order, provide the same confirmed audit findings to the Kings County Superior Court in case no. 19CM-1882;

l. transmit preserved records and confirmed audit findings to appropriate CDCR investigative or oversight channels, including OIA, OIG, or other appropriate law-enforcement or oversight authorities, for administrative or criminal review as permitted by law;

m. implement, for Plaintiff's file and related repositories only, an auditable access-control protocol requiring future access to occur through individually attributable credentials, badge scans, unique user logins, or an equivalent individualized tracking method that records user identity, badge or employee number if available, date and time, terminal or access location if available, system or repository accessed, stated reason for access, and any download, print, copy, export, or transmission activity; and

n. if that logging capability does not already exist in one or more relevant systems,

23

implement an equivalent individualized logging procedure for Plaintiff's file and related materials that will create an auditable record of future access.

5. Prejudgment and post-judgment interest as allowed by law.

6. Costs of suit.

7. Such other and further relief as the Court deems just and proper.

## XI. JURY DEMAND

174. Plaintiff demands trial by jury on all issues so triable.

April 24, 2026

p.p. Jamie Osuna

24